IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| PHILADELPLIA INDEMNITY INSURANCE COMPANY, a Pennsylvania Corporation, | ) ) ) ) | Civ. No. 17-00435 SOM-RT |
| Plaintiff, | ) ) | ORDER GRANTING PLAINTIFF PHILADELPHIA INDEMNITY INSURANCE COMPANY'S MOTION FOR JUDGMENT FOR SPECIFIC PERFORMANCE |
| vs. | ) ) | |
| OHANA CONTROL SYSTEMS, INC., a Hawaii Corporation; AMIR BOROCHOV; and LINDA KINJO, | ) ) ) ) | |
| Defendants. | ) ) ) | |

**ORDER GRANTING PLAINTIFF PHILADELPHIA INDEMINITY INSURANCE COMPANY'S MOTION FOR JUDGMENT FOR SPECIFIC PERFORMANCE**

I.      **INTRODUCTION.**

        Before the court is Plaintiff Philadelphia Indemnity Insurance Company's motion seeking specific performance of an agreement by Defendants Ohana Control Systems, Inc., Amir Borochov, and Linda Kinjo.  Contract damages were awarded to Philadelphia Indemnity by a jury in this diversity action, leaving for post-trial motions any equitable remedies.

        Ohana had entered into construction contracts with the State of Hawaii to install fire alarm systems at several public schools.  The State required Ohana to obtain performance bonds under which a surety would protect the State in the event Ohana defaulted under the contracts.  Philadelphia Indemnity issued the bonds conditioned on the signing of a General Indemnity

Agreement by Ohana, Borochov, and Kinjo under which Defendants agreed, among other things, to post collateral upon demand by Philadelphia Indemnity in the context of claims by the State made under the performance bonds. Philadelphia Indemnity has unresolved disputes with the State and has demanded that Defendants post collateral. Having received no collateral and having established a contract breach at trial, Philadelphia Indemnity now seeks specific performance of Defendants' agreement to post collateral. This court, proceeding without a hearing as permitted by Local Rule 7.1(c), grants Philadelphia Indemnity's motion and orders Defendants to post the demanded collateral.[1]

## II.      BACKGROUND.

### A.    Factual Background.

This case involves three contract categories.

First, Ohana, a Hawaii corporation controlled by Borochov as the company's president and in which Kinjo had an ownership interest, successfully bid on ten different public

---

[1] In an earlier minute order, this court denied Defendants' request for an evidentiary hearing on this motion. During trial, there was substantial evidence going to whether the State's demands on Philadelphia Indemnity were or were not reasonable. As noted later in the present order, the applicable standard in the context of a demand for collateral is whether the demand amount relates to a frivolous claim against a surety. For purposes of this court's analysis under that standard, no evidentiary hearing is needed.

works contracts offered by the State of Hawaii's Department of
Education. All ten contracts involved installing fire alarm
systems at public schools. Three of these construction
contracts are relevant to the present specific performance
motion: contracts to install fire alarm systems at Dole Middle
School, Mililani Middle School, and Benjamin Parker Elementary
School.

Second, the State required Ohana to obtain performance
bonds before beginning work. A performance bond requires a
third party (the surety) to guarantee that a contractor (the
principal) will complete the work that it has agreed to perform
for a customer (the obligee). *See generally Sonoma Springs Ltd.
P'ship v. Fid. & Deposit Co. of Maryland*, 409 F. Supp. 3d 946,
952 (D. Nev. 2019). The surety assumes the risk that the
principal will not complete the work as promised. Philadelphia
Indemnity issued the performance bonds. As the surety,
Philadelphia Indemnity guaranteed that the work that Ohana (the
principal) had promised to do for the State (the oblige) would
be completed.

Under the bonds, if Ohana failed to successfully
install any of the fire alarm systems, Philadelphia Indemnity
had three options. It could (1) remedy the default, (2) take
over the work to be performed and complete it, or (3) pay the
State of Hawaii the cost of completing the contract. ECF No.

231-7, PageID # 4741 (Dole Middle School); ECF No. 231-8, PageID No. 4749 (Mililani Middle School); ECF No. 231-9, PageID # 4767 (Benjamin Parker Elementary School). Each bond also established an upper limit (the "penal sum") on the amount that Philadelphia Indemnity was responsible for in terms of remedying any default by Ohana. ECF No. 231-6, PageID # 4736; ECF No. 231-7, PageID # 4741; ECF No. 231-8, PageID No. 4749; ECF No. 231-9, PageID # 4767. For the three projects at issue, the bonds' combined penal sums total $698,515.00. ECF No. 231-7, PageID # 4741 (setting a penal sum of $260,818.00 for the Dole Middle School bond); ECF No. 231-8, PageID # 4749 (setting a penal sum of $248,888.00 for the Mililani Middle School bond); ECF No. 231-9, PageID # 4757 (setting a penal sum of $188,809.00 for the Benjamin Parker Middle School bond).

The third category of contracts involves Philadelphia Indemnity's right to seek reimbursement from Ohana if, under the bonds, Philadelphia Indemnity had to address defaults by Ohana. In return for agreeing to act as Ohana's surety, Philadelphia Indemnity required Ohana, Borochov, and Kinjo to sign a General Indemnity Agreement with Philadelphia Indemnity. That agreement required Defendants to indemnify Philadelphia Indemnity for (1) any payments made to settle claims made against the bonds, and (2) any costs incurred during the investigation of such claims. ECF No. 231-5, PageID # 4707.

4

The General Indemnity Agreement also required
Defendants to post collateral to provide Philadelphia Indemnity
with security while Philadelphia Indemnity investigated the
validity of any claim against the bonds:

> **POSTING OF COLLATERAL** – [Defendants] agree to deposit
> immediately upon demand by [Philadelphia] an amount
> equal to the greater of (a) the amount of any reserve
> established by [Philadelphia] in its sole discretion
> to cover any actual or potential liability for any
> Loss or potential Loss for which [Defendants] would be
> obliged to indemnify [Philadelphia] hereunder; or (b)
> the amount of any Loss or potential Loss . . . in
> relation to any claims or claims or other liabilities
> asserted against [Philadelphia] as a result of issuing
> any Bond, as determined by [Philadelphia] in its sole
> discretion.

*Id.* at 4708.

Ohana completed several of the fire alarm projects in
2012.  Under the State's procedures, once Ohana completed a
project, the State assigned an inspector to the project.  If the
inspector discovered any problems, he or she provided Ohana with
a punchlist that identified any deficiencies that Ohana needed
to fix.  Once Ohana corrected the issues, the State closed out
each contact and paid Ohana.

Ohana successfully completed four of the projects
(Wahiawa Storefront School, Waikele Elementary School, Waihe'e
Elementary School, and Momilani Elementary School).  But,
according to Borochov, even after closing out the projects, the
State refused to pay Ohana what was owed.  Borochov also

complained about the State's handling of the Puʻuhale Elementary School project. When Ohana notified the State that it had completed that project, the inspector issued a punchlist that noted that Ohana had to provide the State with the fire alarm system's operating manuals and with "as-built" drawings detailing how Ohana had installed the fire alarm systems. According to Borochov. he repeatedly provided the inspector with both items, but the State continued to claim otherwise. Borochov said he concluded that the inspector was intentionally delaying the completion of the projects because the State did not have funds to pay Ohana.

Shortly after the above payment issues arose, Borochov informed the State that Ohana had completed the installation of the fire alarm systems at Dole Middle School, Mililani Middle School, and Benjamin Parker Elementary School. At trial, there was evidence going to delays in the State's inspections of Ohana's work. Ultimately, an inspector found several deficiencies. He provided Ohana with extensive punchlists that included physical changes to all three fire alarm systems. Borochov refused to correct the items on the punchlists because of the State's purported failure to pay Ohana for the work Ohana had already completed.

The State's response to Ohana's refusal to complete the punchlist work was to deem Ohana in breach of the three

construction contracts.  The State informed Philadelphia
Indemnity that, as Ohana's surety, Philadelphia Indemnity could
be liable under the performance bonds.  Philadelphia Indemnity
assigned Kenneth Huff, one of its assistant vice presidents, to
investigate the State's claims.  Huff worked with a number of
individuals, including Craig Colligan, to address the matter.
Colligan attended several meetings with State personnel to
determine how to complete the projects.  Colligan estimated that
completing the three contracts could cost more than $200,000.00.
Huff and Colligan also concluded that Philadelphia Indemnity
lacked the expertise to complete the projects itself.  They
therefore decided that, if Ohana did not complete the three
projects, Philadelphia Indemnity's best course was to pay the
State to complete the projects (the third option under the
performance bonds).

     Huff contacted Borochov to ask whether Ohana would
complete the projects itself.  Borochov declined, explaining
that he would not perform further work for the State because he
did not believe that Ohana would be paid.  He appears to have
been unhappy that Philadelphia Indemnity was in discussions with
the State.  Apparently wanting Philadelphia Indemnity to support
Ohana's position, Borochov refused to cooperate with
Philadelphia Indemnity's investigation into the cost of
completing the contracts.  Huff testified that Borochov's

intransigence increased the costs of completing the contracts, because any company stepping into Ohana's shoes had to reconstruct Ohana's work on its own. Huff said Borochov's position also made it difficult for Huff to accurately assess Philadelphia Indemnity's exposure. Ultimately, in 2017, Huff estimated that Philadelphia Indemnity's liability could exceed $341,734.00. He asked Defendants to post that amount in collateral pursuant to the General Indemnity Agreement. ECF No. 231-10, PageID # 4765. Defendants did not respond.

Concluding that Ohana would not do further work on these projects, the State hired Wasa Electrical Services Inc. to take over. Upon inspecting Ohana's work, Wasa raised a number of issues. At Mililani Middle School, for instance, the system installed by Ohana was, according to Wasa, "unrepairable, with numerous open or shorted fire alarm circuits throughout." ECF No. 234-6, PageID # 5297. Similarly, at Dole Middle School, Wasa said that the system installed by Ohana was "so faulty that the school [had] completely turned off the system." ECF No. 234-3, PageID # 5243.

Wasa also asserted that the State's original specifications did not comply with the fire code in several respects. Wasa proposed expanding the scope of the initial contracts to ensure that the fire alarm systems complied with the fire code. *See* ECF No. 234-3, PageID # 5248 (noting that at

Dole Middle School, Wasa would add "notification devices to meet
current code"); ECF No. 234-6, PageID # 5300 (noting that at
Mililani Middle School, Wasa would add "notification devices to
meet current code"); ECF No. 234-8, PageID # 5333 (noting that
the Honolulu Fire Department was enforcing the fire code more
strictly than it had when the State issued the initial
specifications).  Pointing to these modifications to the
original contracts and to what Wasa claimed was the need to redo
Ohana's original work, Wasa charged the State far more than
Philadelphia Indemnity had originally projected.  The State paid
Wasa more than $1.3 million to complete the three projects.  ECF
No. 231-11, PageID # 4767.

     In 2019, the State filed a demand under the
performance bonds.  *See id.*  The demand sought more than $1.3
million from Philadelphia Indemnity.  *See id.*  Huff testified at
trial that Philadelphia Indemnity intended to argue that it was
not liable for the entire $1.3 million because Wasa had
overcharged the State.  However, he was not certain that he
could reduce Philadelphia Indemnity's liability to an amount not
exceeding $698,515.00, the collective penal sum of the three
bonds.  At that point, Philadelphia Indemnity asked Defendants
to post $698,515.00 in collateral while Philadelphia Indemnity
investigated the State's claims.  *Id.*  As they had with the
earlier collateral demand, Defendants refused.

## B.    Procedural Background

On August 29, 2017, Philadelphia Indemnity filed its complaint in this action.  Count I alleged that Defendants had breached the General Indemnity Agreement by failing to indemnify Philadelphia Indemnity for the costs incurred in investigating the State's claims against the performance bonds and by failing to post collateral.  ECF No. 1, PageID # 10-12.  In particular, the complaint alleged that, on March 28, 2017, Philadelphia Indemnity had asked Defendants to post $371,734.00[2] in collateral, but Defendants had refused.  *Id.* at 10-11. Philadelphia Indemnity alleged that its damages were "likely to exceed $400,000," and would be "in any event no less than $371,734.00."  *Id.* at 12.  In other words, the complaint alleged that Philadelphia Indemnity was entitled to relief based on Defendants' alleged breach of the General Indemnity Agreement in failing to post collateral.

Trial began on January 14, 2020.  On February 4 and 5, the court and the parties discussed jury instructions.  During those discussions, both parties agreed that the jury could award Philadelphia Indemnity damages if it found that Defendants had breached the General Indemnity Agreement by failing to indemnify

---

[2] That demand was based on Philadelphia Indemnity's initial estimates.  As discussed above, by the time trial began, the collateral demand had risen to $698,515.00.

Philadelphia Indemnity for losses incurred in investigating the State's claim. However, the parties agreed that, if Defendants had breached the provision of the General Indemnity Agreement requiring the posting of collateral, money damages were not available. Instead, the parties agreed that specific performance was the appropriate remedy for a failure to post collateral, and that specific performance was an equitable remedy that had to be addressed by the court.

This court therefore proposed asking the jury to determine whether Defendants had breached the General Indemnity Agreement by failing to post collateral, but instructing them not to award any damages for that breach. The court reserved the issue of specific performance for resolution on a post-trial motion. The special verdict form and the jury instructions both reflected that procedure. ECF No. 231-3, Page ID # 4695; ECF No. 231-4, PageID # 4698. Neither party objected to the court's proposal regarding how to proceed with any remedy for a breach of the duty to post collateral or to the special verdict form.

On February 7, 2020, the jury returned a verdict. As to Count I, the jury found that Defendants had breached the General Indemnity Agreement by failing to indemnify Philadelphia for the costs incurred in investigating the State of Hawaii's claims against the bonds. ECF No. 231-4, PageID # 4698-99. The

jury awarded Philadelphia Indemnity $20,260.93 in damages. *Id.* at 4699.

The jury also found that Defendants had breached the General Indemnity Agreement by failing to post collateral. *Id.* at 4698. As instructed, the jury did not award damages for that breach, which the parties had agreed would be addressed in a post-trial motion. *Id.* Defendants had sought their own alleged damages, but the jury found that Defendants had not proved that Philadelphia Indemnity was liable on any of the counterclaims. On February 24, 2020, in accordance with the procedures agreed to by both parties, Philadelphia Indemnity filed the present motion seeking the posting of collateral.

III.    **LEGAL STANDARD.**

The Hawaii Supreme Court has not addressed a plaintiff's burden of proof in a specific performance matter. Specific performance, however, is a remedy in a breach of contract action. *Travelers Cas. & Sur. Co. of Am. v. BCP Constr. of Hawaii, Inc.*, 2019 WL 6718671, at *4 (D. Haw. Dec. 10, 2019). A plaintiff bears the burden of proving a breach of contract claim by a preponderance of the evidence. *Uyeda v. Schermer*, 144 Haw. 163, 174, 439 P.3d 115, 126 (2019) ("Case 639 was a breach of contract case, so the standard of proof was 'preponderance of the evidence.'"). Philadelphia Indemnity therefore bears the burden of establishing its

12

entitlement to specific performance by a preponderance of the evidence.[3]

IV.     **ANALYSIS.**

Sureties are ordinarily entitled to specific performance of collateral security clauses. *Developers Sur. & Indem. Co. v. DKSL, LLC*, 2018 WL 1177918, at *5 (D. Haw. Mar. 6, 2018). When a principal breaches a collateral security provision, the surety's legal remedies are inadequate. An award of damages cannot compensate the surety, because it has not yet suffered any. The very purpose of a collateral requirement is to avoid losses to the surety. What the surety is denied is the "security provision for which [it] bargained[.]" *Safeco Ins. Co. of Am. v. Schwab*, 739 F.2d 431, 433 (9th Cir. 1984); *see also Berkley Reg'l Ins. Co. v. Murray*, 2016 WL 235191, at *5 (D. Md. Jan. 20, 2016) ("Legal remedies are not sufficient because Plaintiff's obligations . . . are continuing, and the total loss

---

[3] The Hawaii Supreme Court has suggested that, under some circumstances, the clear and convincing evidence standard applies in a specific performance action. *See, e.g.*, *Boteilho v. Boteilho*, 58 Haw. 40, 42, 564 P.2d 144, 146 (1977) ("A party seeking to establish a parol contract to convey real property must prove its existence and its terms by clear and convincing evidence."); *Poka v. Holi*, 44 Haw. 464, 357 P.2d 100, 106 (1960) ("Clear, definite and unequivocal evidence is required to warrant specific performance of a parol contract to convey land."). This action does not involve an oral contract to convey land, and Defendants have not argued that the clear and convincing standard applies here.

to Plaintiff is not yet ascertainable." (quotation marks and brackets omitted)).  Accordingly, the surety is entitled to the equitable remedy of specific performance.  *See Murray*, 2016 WL 235191 at *5.

The jury found that that Defendants had breached the General Indemnity Agreement by failing to post collateral. Defendants nevertheless contend that Philadelphia Indemnity is not entitled to an award of specific performance.  According to Defendants, Philadelphia Indemnity's request is both procedurally improper and substantively unreasonable.  Both arguments lack merit.

### A.    Philadelphia is Entitled to Seek Specific Performance in a Post-Trial Motion.

Defendants raise two procedural challenges to Philadelphia Indemnity's specific performance motion.  First, they assert that the jury should have determined the amount of collateral.  ECF No. 234, PageID # 5180.  That assertion is both precluded by Defendants' earlier representations to this court and incorrect.

Defendants are judicially estopped from arguing that the jury should have determined the amount of collateral. "'Judicial estoppel is an equitable doctrine invoked by a court at its discretion.  Its purpose is to protect the integrity of the judicial process by prohibiting parties from deliberately

changing positions according to the exigencies of the moment.'"
*Ah Quin v. Cty. of Kauai Dep't of Transp.*, 733 F.3d 267, 270–71
(9th Cir. 2013) (quoting *New Hampshire v. Maine*, 532 U.S. 742,
749-50 (2001)) (brackets omitted).

"Although judicial estoppel is 'probably not reducible
to any general formulation of principle, . . . several factors
typically inform the decision whether to apply the doctrine in a
particular case.'" *Id.* (quoting *New Hampshire*, 532 U.S. at
750). Those factors include (1) whether a party's later
position is "clearly inconsistent" with its earlier position,
(2) whether the court has accepted the party's earlier position,
and (3) "'whether the party seeking to assert an inconsistent
position would derive an unfair advantage or impose an unfair
detriment on the opposing party if not estopped.'" *Id.* (quoting
*New Hampshire*, 532 U.S. at 751).

It is hard to imagine a stronger case for the
application of the doctrine. Before this action was submitted
to the jury, Defendants agreed with Philadelphia Indemnity and
the court that the issue of collateral should be decided by this
court following a post-trial motion. As a result, the jury,
which determined that Defendants had breached their duty to post
collateral, was specifically told in the special verdict form
not to assess any money award for that breach. *See* ECF No. 231-
4, PageID # 4699. Now, after the trial has ended and the jury

has been discharged, Defendants argue that this court is not the entity that should require the posting of collateral. Judicial estoppel precludes such a reversal of position.[4] *Russell v. Rolfs*, 893 F.2d 1033, 1037 (9th Cir. 1990) (quotation marks omitted).

In any event, even if they had not agreed, Defendants would have no right to a jury trial. Specific performance is a remedy in a breach of contract action. *Travelers Cas. & Sur. Co. of Am. v. BCP Constr. of Hawaii, Inc.*, 2019 WL 6718671, at *4 (D. Haw. Dec. 10, 2019) ("specific performance is a *remedy* rather than an independent claim for relief"); *cf. Lee v. Aiu*, 85 Hawaii 19, 31, 936 P.2d 655, 667 (1997) (reinstating the jury's finding of a breach of a contract but remanding the case to the trial court for the entry of an order directing specific performance). That remedy is equitable. *Lee*, 85 Hawaii at 31, 936 P.2d at 667 ("Lee's claim for specific enforcement is not an action in assumpsit"); *see also Kimball v. Lincoln*, 72 Haw. 117,

---

[4] For the same reasons, even if they had had a right to a jury trial on this issue, Defendants can be said to have waived that right. *See Solis v. Cty. of Los Angeles*, 514 F.3d 946, 953 (9th Cir. 2008) ("Like other constitutional rights, the right to a jury trial in civil suits can be waived."). "[K]nowing participation in a bench trial without objection is sufficient to constitute a jury waiver" if "the party claiming the jury trial right is attempting to act strategically[.]" *Id.* at 955. Defendants have acted strategically by failing to demand a jury trial on the specific performance issue until after the jury was discharged.

126, 809 P.2d 1130, 1134 (1991) ("Appellant's claim for specific performance is clearly equitable in nature and not a claim arising at common law."); *Safeco Ins. Co. of Am. v. Lake Asphalt Paving & Const., LLC*, 807 F. Supp. 2d 820, 826 (E.D. Mo. 2011) ("Specific performance, as sought by plaintiff, is purely an equitable remedy, governed by equitable principles."). The question of whether specific performance is an appropriate remedy must be decided by this court.

Defendants appear to be arguing that, by determining the *amount* of collateral to be posted, the court is invading the province of the jury. *See* ECF No. 234, PageID # 5179-80 (arguing that the jury should have made a finding of fact on the reasonable *amount* of the collateral). The only question the jury needed to decide was whether Defendants had breached the collateral requirement in the General Indemnity Agreement. The jury was not asked to determine what amount of collateral was reasonable. The question of what amount of collateral will compensate Philadelphia Indemnity for Defendants' breach is only relevant to fashioning a remedy for that breach. As stated previously, the appropriate remedy for that breach is the equitable remedy of specific performance.

Defendants note that Philadelphia Indemnity did not request specific performance in the complaint. ECF No. 234, PageID # 5178. The complaint, however, alleged that Defendants

had ignored Philadelphia Indemnity's request that they post $371,734.00 in collateral. ECF No. 1, Page ID # 10-11. It requested "no less than $371,734.00 in damages." *Id.* It is therefore apparent that Philadelphia Indemnity was seeking to address Defendants' failure to post collateral. There is no dispute that Defendants understood that Philadelphia Indemnity was seeking to force them to post collateral. Defendants did not object to the questions on the special verdict form asking whether Defendants had breached the duty to post collateral, and Defendants agreed to a post-trial motion to resolve any specific performance issue.

It is not at all clear that every remedy that is inherent in a claim must be prayed for in a complaint. Even if the complaint does require an amendment to specifically request the remedy of specific performance, the Rules of Civil Procedure permit such an amendment. Under Rule 15(b)(2), "[w]hen an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings . . . . [F]ailure to amend does not affect the result of the trial of that issue." By agreeing that the jury could decide whether Defendants had breached their obligation to post collateral but that the jury would not award any damages for such a breach, Defendants consented to the limited scope of the trial on this issue. Defendants cannot now object to the

very procedures they consented to before the court instructed the jury.[5]

### B. Philadelphia Indemnity's Demand for Collateral is Reasonable.

Defendants also contend that the amount of collateral Philadelphia Indemnity seeks is unreasonable.  In addressing that argument, this court distinguishes two common clauses in performance bonds: indemnification provisions and collateral provisions.  The surety's right to indemnification comes into play after the surety has already investigated a claim against the bond and has made payments to resolve the claim.  An indemnification claim permits the surety to recoup those payments by proceeding against the principal.  *See generally Star Ins. Co. v. Champion Const. Servs. Corp.*, 2014 WL 4065093, at *3-4 (E.D.N.Y. July 30, 2014) (discussing the difference between indemnification and collateral), *report and recommendation adopted*, 2014 WL 4065094 (E.D.N.Y. Aug. 15, 2014).

Collateral provisions, by contrast, permit a surety to receive security when a claim against the bond is pending and

---

[5] Moreover, this court can permit the amendment of the complaint. *See* Fed. R. Civ. P. 15(b)(1) ("If, at trial, a party objects that evidence is not within the issues raised in the pleadings, the court may permit the pleadings to be amended.").  To the extent that it is necessary, this court permits such an amendment.

the surety's investigation is ongoing. *See Safeco Ins. Co. of Am. v. Schwab*, 739 F.2d 431, 433 (9th Cir. 1984). The collateral will be used to make payments against the bond *only if* the surety concludes that the claim is meritorious. *Id.* ("If the claim on the bond must be paid, then the surety will pay the loss from the indemnitor's funds; otherwise, the surety must return the funds to the indemnitor."). Collateral provisions ensure that the surety's investigation into the merit of claims against the bond is not cut short by concerns about the principal's solvency.

Both clauses are constrained by the implied covenant of good faith and fair dealing. *See RLI Ins. Co. v. Pro-Metal Constr. Inc.*, 2019 WL 1368851, at *4 (S.D.N.Y. Mar. 26, 2019) (applying New York law); *see generally Bd. of Directors of Ass'n of Apartment Owners of Discovery Bay Condo. v. United Pac. Ins. Co.*, 77 Haw. 358, 361, 884 P.2d 1134, 1137 (1994) (noting that a surety owes a duty of good faith and fair dealing to a principal). But the limits imposed by the duty of good faith and fair dealing reflect the different functions of the two provisions. Because the surety requests indemnification after investigating an underlying claim and determining that the claim is valid, the duty of good faith and fair dealing permits a surety to request indemnification only if it has reasonably determined that the underlying claim was *actually* valid. *See*

20

*Star Ins. Co.*, 2014 WL 4065093, at *4 ("Under New York law, the surety is entitled to indemnification as long as the payments made in execution of the bonds were reasonable and made in good faith."); *Hartford v. Tanner*, 910 P.2d 872, 880 (Kan. App. 1996) ("Thus, we agree with those cases that hold that the implied covenant of good faith requires a surety seeking indemnification to show that its conduct was reasonable.") (applying Kansas law); *see also Discovery Bay*, 77 Haw. at 361, 884 P.2d at 1137 ("If the surety pays too quickly to the obligee, it may invite liability claims from the principal.").

A collateral request, however, is made before an investigation into the validity of the underlying claims concludes. The principal must post collateral if the surety reasonably believes that a claim against the bond *could possibly* be valid. *See DKSL*, 2018 WL 1177918, at *6 (holding that the collateral demand must be reasonable); *RLI Ins. Co.*, 2019 WL 1368851, at *4-5 (same). "[A] demand for collateral is reasonable if the sum demanded is commensurate with the claims made against the surety or the amount sought by a third party in litigation.'" *DKSL*, 2018 WL 1177918, at *6 (quoting *Star Ins. Co.*, 2014 WL 4065093, at *4); *accord RLI Ins. Co.*, 2019 WL 1368851, at *4-5. Such a demand is reasonable even though the third parties "may ultimately recover only a fraction of what they assert they are owed, or nothing at all." *RLI Ins. Co.*,

2019 WL 1368851, at *4. In this case, the State made a $1.3 million claim against three performance bonds. *See* ECF No. 231-11, PageID # 4767. Philadelphia Indemnity's demand for $698,515.00 in collateral is a little more than half the State's claim and consistent with the penal sums of the bonds. The collateral amount is reasonable.[6]

Of course, a surety cannot request collateral if the underlying claim is patently frivolous. *See RLI Ins. Co.*, 2019 WL 1368851, at *4-5. It is not enough that the claim is *unlikely* to succeed. *See id.* Instead, Defendants must show that "recovery in the amount demanded is definitively barred." *Id.* at *5; *see also id.* at *4 (awarding collateral because the defendants did not point to any facts that would "definitely preclude liability" on the underlying claim).

Defendants essentially argue that the State's claim against the bonds is frivolous. They argue that, when Ohana stopped work on the three projects at issue, the projects were nearly complete. At that point, Ohana only had to complete the items on the inspector's punchlist. *See* ECF No. 234, PageID # 5173-74. At trial, Borochov testified that completing the items

---

[6] In the alternative, Philadelphia Indemnity asks this court to order Defendants to post $1.365,476.00 in collateral (the amount claimed by the State). Because the performance bonds limit Philadelphia Indemnity's liability to $698,515.00, that request is not reasonable.

on the punchlist should have cost less than $20,000, and, as a result, the State cannot reasonably claim more than that amount. *Id.* at 5182. Because the State still owed Ohana $118,000 under the contracts, *see id.* at 5178, Defendants maintain that any claim that Ohana owes the State money is frivolous.

Defendants do not account for evidence indicating that Wasa had to do far more than complete the original punchlist items. For instance, at Dole Middle School, Wasa reported that "the system as installed by the original contractor . . . is not fully functional and operational. It is so faulty that the School has completely turned off the system putting them at risk." ECF No. 234-3, PageID # 5243. And at Mililani Middle School, Wasa informed the State that "a complete redo of the fire alarm system is required since the current system is unrepairable, with numerous open or shorted fire alarm circuits throughout." ECF No. 234-6, PageID # 5297. Even though Defendants challenge Wasa's assertions, this evidence indicates that Philadelphia Indemnity had reason to be concerned that it might have to pay at least up to the penal sums of the bonds.

In the alternative, Defendants argue that even if the State may be entitled to some damages, Philadelphia Indemnity has asked Defendants to post an unreasonable amount of collateral. Defendants' argument proceeds in two parts. First, they maintain that, in 2014, Philadelphia Indemnity's own expert

concluded that a total replacement of the existing fire alarm systems at the three schools would cost $248,290.30.  ECF No. 234, PageID # 5174, 5184.  Second, Defendants assert that, as a matter of law, Philadelphia Indemnity is not liable for any work Wasa performed that fell outside the scope of Ohana's original contracts with the State.  *See* ECF No. 234, PageID # 5176. Defendants thus appear to argue that, because the cost of completing the original contracts could not have been more than $248,290.30, any collateral demand exceeding $248,290.30 is unreasonable.

Both arguments may ultimately prove correct.  This court is not here making a definitive ruling that any of the State's demands will win the day.  But that does not, without more, make the State's claim for $1.3 million frivolous.  As to the cost of fixing Ohana's alleged mistakes, it appears that Wasa ultimately charged the State more than Philadelphia Indemnity initially estimated.  *See* ECF No. 234, PageID # 5187 (arguing that Wasa overcharged the State for its services). According to Borochov, those charges were unreasonably high. *See id.*  That assertion may permit Philadelphia Indemnity to ultimately reduce the State's claims against the bonds.  At this stage, however, Philadelphia Indemnity could reasonably conclude that it *might* have to pay at least the penal sums of the bonds, which total a little more than half of the amount Wasa billed.

That is enough to support a collateral demand. *See RLI Ins.
Co.*, 2019 WL 1368851, at *4 (awarding collateral even though the
defendants "vehemently denied" the merit of the underlying
claims).

Similarly, Philadelphia Indemnity could not out of
hand dismiss the State's claims based on work outside the scope
of the original contracts. Courts have held that a surety may
be released from its obligations under a performance bond if the
government makes a substantial change (a "cardinal change") to
the underlying contract without the surety's consent. *U.S. ex
rel. Sun Const. Co. v. Torix Gen. Contractors, LLC*, 2009 WL
3348287, at *3 (D. Colo. Oct. 15, 2009); *see also Hartford Cas.
Ins. Co. v. City of Marathon*, 825 F. Supp. 2d 1276, 1285 (S.D.
Fla. 2011) (noting that "many state and federal courts
throughout the nation accept [the cardinal change] doctrine as a
valid defense in the context of both public and private
construction contracts"), *rev'd in part on other grounds*, 501 F.
App'x 929 (11th Cir. 2012). Whether a specific modification to
a contract is a "cardinal change" depends on the circumstances
surrounding that change. Courts ask whether, after the
modifications, the contract calls for "essentially the same work
as the parties bargained for when the contract was awarded[.]"
*Sun Const. Co.*, 2009 WL 3348287, at *3 (internal quotations
omitted). In making that determination, courts consider "(1)

25

whether there was a significant change in the magnitude of work to be performed; (2) whether the change significantly altered the quality, nature, or type of work contemplated by the original contract; and (3) whether the cost of the work ordered greatly exceeds the original contract cost." *Id.*

That doctrine certainly may apply here. Ohana relied on the State's specifications when it bid on the three projects. After it hired Wasa, the State altered those specifications, apparently to ensure that the fire alarm systems would satisfy even enhanced enforcement of the fire code. Those changes significantly increased the costs of completing the contracts. *See* ECF No. 234-6, PageID # 5296-97. The cardinal change doctrine therefore may apply, on the theory that Ohana should not have to make substantial payments for work that it did not bid on and that it has never been paid to complete. But Philadelphia Indemnity cannot be certain that a court will determine that the modified contracts do not involve "essentially the same work" as the original contracts. After all, both the original contracts and the modified contracts call for the installation of fire alarm systems. It was reasonable for Philadelphia Indemnity to conclude that it *could* be liable for the cost of completing the contracts modified to ensure compliance with a more strictly enforced fire code.

In sum, Defendants have raised arguments that may substantially reduce the State's claims against the bonds. Indeed, at trial, Huff acknowledged that Philadelphia Indemnity was attempting to demonstrate that the State was entitled to much less than $1.3 million.  However, he expressed concerns that Philadelphia Indemnity might fail to reduce the claims to $698,515.00 or less.  In light of the significant legal and factual issues surrounding the State's claims, those concerns are legitimate.  Philadelphia Indemnity's request for $698,515.00 in collateral represents a reasonable estimate of its *potential* liability.  Accordingly, Ohana, Borochov, and Kinjo must collectively deposit $698,515.00 in cash as collateral.

That does not mean that Philadelphia Indemnity is entitled to that amount in indemnification.  It must carefully consider the arguments advanced by Defendants before making any payments to the State.  Defendants could also file a declaratory action against the State to establish that the State's claims are inflated.  In the interim, however, Philadelphia Indemnity is entitled to the collateral security that it bargained for under the General Indemnity Agreement.

### C. Philadelphia Indemnity's Other Pending Equitable Claims are Dismissed.

Philadelphia Indemnity's complaint included three claims other than its breach of contract claim (Count I). The other three claims sought equitable relief. Count II (unjust enrichment) was withdrawn by Philadelphia Indemnity during trial. Count III (*quia timet*) sought to restrain Defendants from dissipating or conveying their assets during the pendency of this case. Because this court orders the posting of collateral by April 30, 2020, this count appears moot and is dismissed on that ground. Count IV (foreclosure of security interest) was withdrawn by Philadelphia Indemnity and in any event would be moot in light of the present order. Any other matter that this court announced during trial that it was taking under advisement is, if not yet ruled on, deemed withdrawn because not raised in a post-trial motion or rendered moot by this order.

## V.      CONCLUSION.

Philadelphia Indemnity's motion for specific performance is granted. Defendants are ordered to collectively deposit $698,515.00 in cash collateral with Philadelphia Indemnity no later than April 30, 2020. The collateral should be delivered by certified check, wire transfer, or an equivalent means.

Because this order disposes of all remaining claims, the Clerk of Court is directed to enter judgment for Philadelphia Indemnity. The judgment should state that Count III is dismissed as moot, that all counterclaims are dismissed consistent with the verdict, and that Philadelphia Indemnity is awarded $20,260.93 in damages and specific performance in the form of the posting by Defendants of cash collateral in the amount of $698,515.00 no later than April 30, 2020. Given the pendency of Defendants' motion for new trial, the parties are referred to Rule 4 of the Federal Rules of Appellate Procedure regarding appeal deadlines. The court's intent is to rule on the prejudgment interest issue after entry of judgment, which would allow calculation of prejudgment interest, if any, up to the known date of judgment

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, March 31, 2020.



/s/ Susan Oki Mollway

Susan Oki Mollway
United States District Judge

*Philadelphia Indemnity Insurance Co. v. Ohana Control Sys., Inc.*, Civ. No. 17-00435 SOM-RT; ORDER GRANTING PLAINTIFF PHILADELPHIA INDEMINITY INSURANCE COMPANY'S MOTION FOR JUDGMENT FOR SPECIFIC PERFORMANCE.